**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**NORMAN BRUCE BECK,**

　　　　　**Plaintiff,**

**v.**                                              **Case No.: 3:11-cv-00711**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

　　　　　**Defendant.**

**MEMORANDUM OPINION**

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying plaintiff's application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (ECF Nos. 14 and 17). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7 and 9). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.    Procedural History**

Plaintiff, Norman Bruce Beck (hereinafter referred to as "Claimant"), filed for DIB and SSI on May 7, 2007, (Tr. at 140, 148), alleging disability due to prior stroke, use of a

pace maker, high blood pressure, high cholesterol, diabetes, knee pain, and back pain.[1] (Tr. at 162). The Social Security Administration ("SSA") denied the application initially and upon reconsideration. (Tr. at 93, 104). On May 19, 2008, Claimant filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 111). The administrative hearing was held on July 23, 2009 before the Honorable Roseanne M. Dummer. (Tr. at 35-88). By decision dated November 27, 2009, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-28).

The ALJ's decision became the final decision of the Commissioner on August 25, 2011 when the Appeals Council denied Claimant's request for review. (Tr. at 1-4). On October 7, 2011, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed his Answer and a Transcript of the Proceedings on December 12, 2011. (ECF Nos. 10 and 11). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 14 and 17). Therefore, this matter is ripe for resolution.

## II.    __Claimant's Background__

Claimant was 44 years old at the time of his alleged disability onset. (Tr. at 39, 42). He attended school to 12th grade, but did not graduate, and later obtained a GED. (Tr. at 40). Claimant previously worked as a night maintenance person at McDonald's. (*Id.*). He communicates in English.

On January 27, 2007, Claimant suffered from a stroke (transient ischemic attack), for which he sought immediate treatment. (Tr. at 289-90). During hospitalization, he was diagnosed with diabetes, high blood pressure (hypertension),

---

[1] Subsequently, Claimant alleged additional mental impairments including "depression, short term memory, anger problems, difficulty dealing with people, problems with crowds and strangers, and anxiety that has affected him throughout his life." (Tr. at 19).

high blood cholesterol (hyperlipidemia), and a complete heart block, which was discovered after Claimant was asystole for over five seconds. (Tr. at 286, 290). Claimant alleged that he became unable to work because of his disabling condition on February 28, 2007, stating that "[a]fter I got out of the hospital, I wasn't very much good at all. (Tr. at 140, 148). Since then, Claimant has undergone a myriad of medical examinations and assessments related to his cardiovascular status and other physical ailments. In 2007, Claimant and his family lost their home and moved into his wife's parents' home. (Tr. at 406). In December of 2007, Claimant commenced mental health treatment at Prestera Center for depression and anxiety. (Tr. at 411-12). Claimant continued his mental health treatment at least through the date of his administrative hearing.[2] (Tr. at 682).

## III.  **Relevant Medical Records**

The Court has reviewed the Transcript of Proceedings in its entirety including the medical records in evidence. Given that Claimant's challenges primarily involve his mental health impairments, the undersigned summarizes below Claimant's mental health treatment and evaluations to the extent that they are relevant to the issues in dispute.

### A.  **Prestera Mental Health Center Records**

#### 1.  *Treatment Notes and Mental Status Evaluations*

On December 11, 2007, Claimant sought mental health treatment from Prestera Mental Health Centers ("Prestera"). (Tr. at 406). His chief complaints were depression and anxiety, which had "bec[o]me prominent after becoming injured, out of work, and losing his home." (Tr. at 406). Claimant also "report[ed] experiencing paranoid and

---

[2] The last date for which a Prestera record exists is August 28, 2009, (Tr. at 682), while the last date for which other records in the transcript exist is October 8, 2009. (Tr. at 686-91).

delusional thoughts when in public." (Tr. at 406). In his initial mental status evaluation, Claimant reported insomnia, diminished appetite, no suicidal or homicidal ideation, some delusions/paranoia, and difficulty remembering day-to-day activities. (Tr. at 409-10). The access center clinician described Claimant as "within normal limits" or otherwise unexceptional in his appearance (hygiene, posture, gait, dress), sensorium, attitude, eye contact, attention span, impulse control, mood, affect, intellectual functioning, insight, and judgment. (Tr. at 409-10).

The record shows that Claimant met with a Prestera therapist roughly once a month for discussion-based therapy sessions, while a physician's assistant managed Claimant's medication with appointments occurring every few months: Claimant met with Prestera therapist Nicole Wilson on January 8, January 23, March 4, March 26, April 16, June 3, July 3, August 1, September 5, October 1, November 14, and December 18 of 2008, and January 16 or 2009. (Tr. at 404, 405, 493, 527, 540, 542, 545, 645, 647, 650-51 652, 655, at 657). He met with Prestera therapist Marybeth Smith on February 11, May 13, July 8, August 4, and August 18 of 2009, (Tr. at 659, 673-74, 676, 678, and 680), and with Prestera Physician's Assistant (PA) Sarah Rodes on February 9, March 7, May 2, July 3, October 1, and December 10 of 2008, and March 20, June 30, August 29 of 2009. (Tr. at 402-03, 491, 541, 544, 649, 654, 672, 675, and 682).

In all of therapist Wilson's session notes, she described Claimant's mental status as "within normal limits" or as showing "no significant change from last visit." (Tr. at 404, 405, 493, 527, 54, 542, 645, 647, 650, 652, 655, and 657). Similarly, therapist Smith initially reported all of Claimant's mental status attributes as "unremarkable," describing him as "oriented x4" and a danger to none. (Tr. at 659). In all subsequent session notes, Smith described Claimant's mental status as simply "alert and oriented

x4." (Tr. at 659, 673-74, 676, 678, and 680). Likewise, aside from periodically presenting as anxious or depressed in mood, PA Rodes's assessments of Claimant's mental status were wholly unexceptional. (Tr. at 402-03, 491, 541, 544, 649, 654, 672, 675, and 682).

Notes from therapist Wilson's first meeting with Claimant on January 8, 2008 reflect that his primary difficulty was in coping with recent changes in his life, including chronic pain, loss of his home, moving in with parents-in-law, and having no income. (Tr. at 405). These concerns, as well as several deaths in the family, turned out to be recurring themes throughout the course of Claimant's treatment at Prestera as documented in the following treatment records:

- Claimant "has low self esteem and his pride has been injured by his inability to work and provide for his family." (Tr. at 404)

- Claimant "is doing fair but continues to have some problem areas to discuss, most are related to his physical health and relational problems." (Tr. at 450)

- Claimant reports that he "had been doing ok" and had not had any major episodes with his father-in-law. (Tr. at 542)

- Claimant's "physical health plays a major role in the continuation of his depression" and "the family also struggles a great deal financially." (Tr. at 545)

- Claimant has "been supportive of his wife" whose mother had recently become terminally ill. (Tr. at 645)

- Claimant reports that he had been "spending most of his time taking care of his children and helping his wife" handle the grief of losing her mother. (Tr. at 647)

- Claimant "feels like he should be doing more to support his family and becomes depressed when he realizes that he may never be able to work again." (Tr. at 650)

- Claimant explores coping options for the unexpected loss of his mother. (Tr. at 652)

- Claimant reports feeling "moody" and "like a failure." (Tr. at 655)

- Claimant reports that he and his wife were mostly "doing okay," though he still grieves for his mother. (Tr. at 657)

- Claimant reports that not being able to work has been a difficult transition for him. (Tr. at 659)

- Claimant reports "frustration with not being able to work and provide for the family" and about frequent arguments with his wife. (Tr. at 676)

- Claimant reports frequent arguments with his wife and feelings of helplessness due to not being able to work and not bringing in any income. (Tr. at 678)

- Claimant reports feeling emasculated. (Tr. at 680)

However, the use of medication and the development of coping strategies appeared to have had some positive effect on Claimant's depression and anxiety as documented below:

- Claimant "discussed options for change and coping." (Tr. at 404-05)

- Claimant reports improvement since taking Cymbalta. (Tr. at 491)

- Claimant "feels that Cymbalta has helped his depression and he is starting to feel less anger." (Tr. at 493)

- Claimant had "shown some minor improvements with the regimen he is taking." (Tr. at 540)

- Claimant "enjoys taking walks and often goes and sits outside when he needs to calm down." (Tr. at 542)

- Claimant reports that "his medication has been helping him," and the therapist observes that Claimant had "learned some good coping skills including walking that have helped him stay calmer." (Tr. at 645)

- Claimant reports that he is "much better at handling stress when he has Ativan to help him." (Tr. at 647)

- Claimant reports that medication has helped. "I don't have the totally hopeless/helpless feeling any more." (Tr. at 649)

- Claimant acknowledges that medication is working, stating "I have been wondering if Cymbalta was helping – and I know that it is. Because I forgot mine when I went out of town." (Tr. at 654).

### 2. Internal Assessments by Prestera Staff

Claimant's therapists also completed periodic internal assessments of Claimant's mental health on December 11, 2007; March 27, July 3, October 3 of 2008; and March 11 of 2009. (Tr. at 411-18, 528-39, 546-57, 632-43, 660-71).

On December 11, 2007, Clinician David Hendricks completed an initial internal assessment of Claimant. (Tr. at 411-18). In the "Functional Status/Treatment Plan" portion of the internal assessment, Clinician Hendricks indicated the following levels of required assistance: "School–Independent with Past History of Functional Deficit; Activity of Daily Living–With Minimal Assistance; Maintain Relationships–With Minimal Assistance; Self Administer Medications–No History of Functional Deficit/Not Applicable; Maintain Personal Safety–No History of Functional Deficit/Not Applicable; Access Other Services–No History of Functional Deficit/Not Applicable." (Tr. at 416). Clinician Hendricks diagnosed Claimant with "Major Depressive Disorder Recurrent–Moderate" and assigned him a Global Assessment of Functioning (GAF) score of 55.[3] (Tr. at 417).

Therapist Wilson completed the next three assessments of Claimant, the results of which remained largely the same. In the "Functional Status/Treatment Plan" section of each assessment, Wilson reported the same levels of required assistance as listed in the initial internal assessment. (Tr. at 533-34, 551-52, and 637-39). In the "Adult

---

[3] The GAF scale is a tool for rating a person's overall psychological functioning on a scale of 0-100.  This rating tool is regularly used by mental health professionals and is recognized by the American Psychiatric Association in its *Diagnostic and Statistical Manual of Mental Disorders (DSM) IV-Text Revision (*4th ed.).  A score of 51-60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning.
.

MH/SA Functional Assessment Instrument" section of each assessment, therapist Wilson reported Mild Dysfunction with respect to Claimant's capacity for "Self Care" and "Activities of Community Living;" Moderate Dysfunction with respect to Claimant's capacity for "Social Interpersonal and Family" interactions and "Concentration and Task Performance;" and No Dysfunction with respect to "Maladaptive, Dangerous and Impulsive Behaviors" of the Claimant. (Tr. at 534-37, 552-55, and 639-41). These categorical determinations were based upon a series of questions regarding specific functional capacities of the Claimant. (*Id.*) Finally, in each assessment, Wilson diagnosed Claimant with "Major Depressive Disorder Recurrent—Moderate" and "Generalized Anxiety Disorder," and assigned him a GAF score of 55. (Tr. at 538, 556, and 642).

Therapist Smith completed the final internal assessment of Claimant. (Tr. at 660-71). In the "Functional Status/Treatment Plan" section of each assessment, Smith reported the same levels of required assistance as in the initial internal assessment. (Tr. at 665-66). In the "Adult MH/SA Functional Assessment Instrument" section of each assessment, Smith reported Mild Dysfunction with respect to Claimant's "Self Care"; Moderate Dysfunction with respect to Claimant's "Activities of Community Living," "Social Interpersonal and Family" interactions and "Concentration and Task Performance;" and No Dysfunction with respect to "Maladaptive, Dangerous and Impulsive Behaviors" of the Claimant. (Tr. at 666-69). Again, these determinations were based upon a series of questions regarding specific functional capacities of the Claimant. (Tr. at 666-69). Smith diagnosed Claimant with "Major Depressive Disorder Recurrent—Severe without Psychotic" and "Generalized Anxiety Disorder," but assigned him the same GAF score of 55 as previously determined. (Tr. at 670-71).

### 3. *RFC Assessments by Prestera Staff*

On February 26, 2008, PA Rodes completed a Mental Impairment Questionnaire (RFC and Listings).[4] (Tr. at 419-26). Rodes reported moderate limitation in Claimant's ability to: understand and remember very short and simple instructions, carry out very short and simple instructions, make simple work-related decisions, and be aware of normal hazards and take appropriate precautions. (Tr. at 423-25). With respect to all other functional areas, Rodes reported marked limitation in Claimant's abilities. (*Id.*). On July 15, 2009, PA Rodes completed another Mental Impairment Questionnaire (RFC and Listings).[5] (Tr. at 497-502). Rodes characterized Claimant as "moderately limited" in his ability to: remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions or request assistance, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others. (Tr. at 499-502). Rodes characterized Claimant as "markedly limited" in his ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention for extended periods, work in coordination or proximity without being unduly distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and travel in unfamiliar places or use public transportation. (*Id.*). Rodes

---

[4] Therapist Wilson also signed the questionnaire. (Tr. at 426).

[5] Therapist Smith also signed the questionnaire. (Tr. at 502).

characterized Claimant as "extremely limited" in his ability to: maintain regular attendance and be punctual within customary tolerances, complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to change in a routine work setting. (*Id.*).

Additionally, on July 25, 2009, therapist Smith signed a letter addressed "To Whom It May Concern," in which she described Claimant's diagnosis and the impact of his symptoms on several areas of his life. (Tr. at 496). Based upon both Claimant's reports and her own observations, Smith concluded that "[d]ue to the severity of his symptoms and diagnosis, [Claimant] would have great difficulty interacting and appropriately performing tasks in a work setting." (*Id.*).

### B. Non-Prestera Mental Health Assessments

#### 1. *Agency Assessments*

On May 5, 2008, Elizabeth Durham, MA, Licensed Psychologist, completed a psychological evaluation at the request of the West Virginia Disability Determination Service. (Tr. at 449-53). As part of her report, Ms. Durham conducted a clinical interview and mental status examination. (Tr. at 449). Ms. Durham found that Claimant's attitude and behavior, social interaction, speech, orientation, thought processes, thought content, perception, insight, judgment, immediate memory, recent memory, remote memory, concentration, and psychomotor behavior were all within normal limits or otherwise appropriate, though his mood was dysphoric and his affect was restricted. (Tr. at 451). Claimant denied suicidal or homicidal ideation. (*Id.*). Ms. Durham diagnosed Claimant with depressive disorder not otherwise specified, and anxiety disorder not otherwise specified based upon Claimant's reports of depressed

mood and frequent anxiety and worry. (Tr. at 451-52). Ms. Durham then reviewed Claimant's daily activities, which consisted of watching television, taking care of his 3-year-old, eating, and taking medicine. (Tr. at 452). Ms. Durham concluded that Claimant's social functioning, concentration, persistence, and pace were all within normal limits. (*Id.*).

On May 12, 2008, Timothy Saar, Ph.D, completed a Psychiatric Review Technique at the request of the Social Security Administration. (Tr. at 455-68). Dr. Saar found that Claimant suffered from affective and anxiety-related disorders, but that Claimant's mental impairments were not severe. (Tr. at 455). Dr. Saar diagnosed Claimant with depression not otherwise specified and anxiety disorder not otherwise specified. (Tr. at 458-60). Dr. Saar evaluated Claimant's functional limitations and found that Claimant suffered from no functional limitations or episodes of extended decompensation. (Tr. at 465-66). Further, Dr. Saar found Claimant to be only partially credible and that the medical record did not support Claimant's disability claim. (Tr. at 467). Dr. Saar concluded that Claimant could manage basic activities of daily living and social interactions with mild limitations. (*Id.*).

On September 30, 2009, Lisa Tate, MA, Licensed Psychologist, performed a second psychological evaluation at the request of the West Virginia Disability Determination Service. (Tr. at 686). As part of her report, Ms. Tate completed a clinical interview, mental status examination, and an RFC assessment. (Tr. at 683-90). Ms. Tate found that Claimant's orientation, mood, affect, thought processes, thought content, perception, insight, immediate memory, remote memory, and psychomotor behavior were all within normal limits or otherwise appropriate, but that Claimant's recent memory and concentration were mildly deficient. (Tr. at 689). Claimant denied suicidal

or homicidal ideation. (*Id.*). Ms. Tate diagnosed Claimant with "anxiety disorder not otherwise specified with features of panic" and "major depressive disorder, single episode, moderate, chronic" based upon Claimant's self-report of related symptoms. (*Id.*). Claimant described daily activity consisting of watching television; weekly activities consisting of sitting outside, taking a shower, and visiting his friend; monthly activities consisting of doing laundry, cutting grass with a riding mower, going to the grocery store, and attending treatment appointments related to both his physical and mental health. (Tr. at 690). Ms. Tate described Claimant's social functioning, persistence, and pace as within normal limits, but noted his concentration was mildly deficient. (*Id.*).

### 2. *Claimant-Referral Assessment*

On July 5, 2008, Sheila Emerson Kelly, MA, Licensed Psychologist, completed a psychological evaluation at the request of Claimant's attorney. (Tr. at 470). As part of her report, Ms. Kelly conducted a clinical interview and a mental status examination, completed a RFC assessment, and administered the following psychological tests: Minnesota Multiphasic Personality Inventory-2 (MMPI-2), Millon Clinical Multiaxial Inventory-III (MCMI-III), Wide Range Achievement Test-4 (WRAT-4), and Beck Depression Inventory-II. (*Id.*).

In her written report, Ms. Kelly provided an overview of Claimant's background, including medical and family history. (Tr. at 470-73). She noted that Claimant had four children living at home, ages 23, 8, 6, and 3. Claimant, his wife, and his children moved in with his in-laws after Claimant stopped working and he now spent his days watching the younger children. Ms. Kelly described Claimant's daily activities as including driving occasionally, going outside with his kids to "watch after them" and "play a little ball with

them," visiting a friend approximately once a week and teaching him to restore old trucks, listening to music, and watching television. (Tr. at 474-75). After reviewing the history, Ms. Kelly documented the results of the mental status examination. She recorded that Claimant described sleeping at varying hours but estimated sleeping around 6 to 7 hours per day and reported that "his mood is irritable and that he has an explosive temper which is somewhat relieved by medications." (Tr. at 475). Ms. Kelly noted that Claimant was depressed and anxious but denied suicidal ideation. (*Id.*). She also observed that he "displays some social anxiety and paranoia accompanied by problems with authority." (*Id.*). Next, Ms. Kelly summarized the results of the tests. (Tr. at 475-76). On the WRAT-4, Claimant's in Word Reading and Math Computations corresponded with "Low Average" functioning levels, which Ms. Kelly stated were "fair considering his educational background and certainly adequate for day-to-day affairs." (Tr. at 475). On the Beck Depression Inventory-II test, Claimant's score reflected severe levels of depression. (*Id.*). Significantly, both the MMPI-2 and the MCMI-III tests were considered invalid, which Ms. Kelly opined was "probably because of symptom magnification on [Claimant's] part." (*Id.*). Ms. Kelly then outlined the bases for her RFC assessment. (Tr. at 476-77). She reiterated that Claimant's activities of daily living primarily consisted of babysitting his three younger children, helping a friend work on his truck, and driving rarely. (Tr. at 476). Ms. Kelly noted that Claimant's social circle was limited due to his paranoia and social anxiety, as well as his low self-esteem. (*Id.*). However, Ms. Kelly observed "no significant problems in attention and concentration" despite acknowledging that Claimant appeared to be depressed and socially anxious. (*Id.*). Ms. Kelly also opined that "the number of vocational choices available to him have narrowed somewhat" due to Claimant's health problems, including stroke and

installation of a pacemaker. (Tr. at 476-77). Ms. Kelly diagnosed Claimant with depressive disorder not otherwise specified; anxiety disorder not otherwise specified; and avoidant, dependent, and paranoid personality traits but ruled out personality disorder. (Tr. at 477).

Finally, in her RFC assessment, Ms. Kelly designated Claimant as "slightly limited" in his abilities to: remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions or request assistance, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in a routine work setting. (Tr. at 479-80). Ms. Kelly designated Claimant as "moderately limited" in his abilities to: understand and remember detailed instructions, carry out detailed instructions, maintain attention for extended periods, maintain regular attendance and be punctual within customary tolerances, complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (*Id.*). Ms. Kelly designated Claimant as "markedly limited" in his abilities to: work in coordination or proximity to others without being unduly distracted by them, and accept instructions and respond appropriately to criticism from supervisors. (*Id.*). She reported no extreme limitations. (*Id.*).

**IV.    Summary of ALJ's Findings**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, then the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the

burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. §§ 404.1520a, 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the

claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirement of the Social Security Act through December 31, 2010. (Tr. at 16, Finding No. 1). The ALJ then determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since February 28, 2007, the alleged disability onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of: status post cerebrovascular accident with no residual symptoms; diabetes mellitus; hypertension; hyperlipidemia; third degree heart block; sinus pause; low back pain; chronic left knee pain; compression fracture; depressive disorder; and an anxiety disorder. (*Id.*, Finding No. 3). The ALJ considered Claimant's past history of ingrown toenails but found this medical impairment to be non-severe. (*Id.*) The ALJ also found that Claimant's

purported "avoidant, dependent, and paranoid personality traits" and past incidence of abdominal pain were not medically determinable impairments. (*Id.*).

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment contained in the Listing. (*Id.*, Finding No. 4). The ALJ then found that Claimant had the following RFC:

> [C]laimant has the residual functional capacity to perform light work ... except the claimant can never climb ladders, ropes or scaffolds. He can only occasionally stoop, kneel, crouch, and crawl. He must avoid concentrated exposure of cold, heat, vibration, and the hazards of work involving dangerous moving machinery and heights. The claimant is limited to frequent, but not constant manipulation with the hands. Further, he is limited to one to two step simple type work and tasks. In addition, the claimant is limited to brief and superficial contact with the public.

(Tr. at 18, Finding No. 5). As a result, under the fourth inquiry, Claimant was found unable to return to his past relevant employment. (Tr. at 25, Finding No. 6). The ALJ noted that Claimant was 44 years old at the time of the alleged disability onset date, which qualified him as a "younger individual age 18-49." (Tr. at 26, Finding No. 7). He had a high school education and could communicate in English. (*Id.*, Finding No. 8). The ALJ found that transferability of job skills was not an issue, because the Medical-Vocational Rules supported a finding of "not disabled" regardless of transferability of skills. (*Id.*, Finding No. 9). The ALJ then considered all of these factors and, relying upon the testimony of a vocational expert, determined that Claimant could perform the various occupations that existed in significant numbers in the national and regional economy. (Tr. at 26). At the unskilled, light level, Claimant could function as a night guard, product inspector, and mail sorter; at the unskilled, sedentary level, Claimant was capable of performing jobs such as package machine tender, product inspector, and surveillance monitor. (Tr. at 27, Finding No. 10). On this basis, the ALJ concluded that

Claimant was not under a disability as defined by the Social Security Act. (Tr. at 28, Finding No. 11).

## V.    **Claimant's Challenges to the Commissioner's Decision**

Claimant raises four challenges to the Commissioner's decision. First, Claimant argues that the ALJ failed to properly consider the opinions of Claimant's treating mental health providers. (Pl.'s Br. at 15). Second, Claimant argues that the ALJ did not properly consider the combined effect of all of Claimant's impairments. (Pl.'s Br. at 22). Third, Claimant argues that the ALJ did not properly evaluate lay witness testimony. (Pl.'s Br. at 29). Finally, Claimant argues that the ALJ's hypothetical question to the vocational expert was incomplete. (Pl.'s Br. at 34).

## VI.    **Scope of Review**

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v.*

*Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered each of Claimant's challenges in turn and finds them unpersuasive. To the contrary, having scrutinized the record as a whole, the Court concludes that the decision of the Commissioner finding Claimant not disabled is supported by substantial evidence.

## VII.   <u>Analysis</u>

### A.   **ALJ's Consideration of the Prestera RFC Assessments**

Claimant contends that the ALJ failed to properly consider the opinion of Prestera Physician's Assistant ("PA") Sarah Rodes, in light of the ALJ's statements that:

> Ms. Rodes' opinions are based on the claimant's subjective complaints and inconsistent with the overall record, as treatment notes indicate merely minor problems in functional areas. It would seem reasonable that were the claimant impaired to the extreme extent described, aggressive treatment modalities may be advisable. . . More importantly, Ms. Rodes' opinions are also internally inconsistent and the record does not reflect a significant decline in the claimant's ability to function mentally.

(Pl.'s Br. at 15-20 (citing Tr. at 25)).[6] Furthermore, Claimant argues that the ALJ should have sought clarifying information from the Prestera treatment providers to the extent that their opinions created an ambiguity in the record. (Pl.'s Br. at 21). In response, the

---

[6] Claimant also objects that the ALJ ignored the fact therapists Nicole Wilson and Marybeth Smith supported Rodes's RFC assessments. (Pl.'s Br. at 15 n.8). However, it appears that Rodes and a therapist prepared each assessment jointly, as both Rodes and Wilson signed the first assessment while Rodes and Smith signed the second assessment.  (Tr. at 426, 502). To the extent that each RFC assessment was prepared jointly by Rodes and a therapist, each assessment is treated as a single opinion. Because the ALJ attributed the Prestera RFC assessments to Rodes, the undersigned does so as well.

Commissioner argues that the therapists and physician's assistant are not "acceptable medical sources" whose opinions merit deference under the regulations. (Def. Br. at 13). The Commissioner argues further that the ALJ had no duty to seek clarification of the opinions of the counselors and physician's assistant because they were not unclear or ambiguous. (Def. Br. at 15). Rather, the Commissioner argues that the ALJ properly weighed and discounted the opinions of the counselors and physician's assistant as inconsistent and unsupported by the evidence of the record. (*Id.*).

Although therapists and nurse practitioners do not constitute "acceptable medical sources" to establish whether a claimant has a medically determinable impairment, they are considered "other sources" whose opinions may be used to show the severity and effect of a claimant's impairments on his ability to work. 20 C.F.R. §§ 404.1513 and 416.913. Social Security Ruling 06-03p provides guidance on how the opinions of "other sources," including therapists and physicians' assistants should be considered on the issue of disability. SSR 06-03p. When weighing opinions offered by sources who are not "acceptable medical sources," the ALJ should consider the same factors that apply to the medical opinions of "acceptable medical sources," which include: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. *Id.* at *4. "The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because. . .

'acceptable medical sources' are the more qualified health care professionals." *Id.* at *5 (internal quotations omitted). Ultimately, however, "[e]ach case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id.*

### 1. *Discounting the RFC Opinion of PA Rodes*

Claimant raises a number of objections to the ALJ's treatment of PA Rodes' opinions. First, Claimant disputes that PA Rodes' opinions were based on "subjective complaints." (Pl.'s Br. at 16). According to Claimant, "his counselor specifically and unequivocally stated that the determination of [Claimant's] symptoms were based on 'observation' in a clinical setting," which he therefore contends "constituted objective evidence of [Claimant's] mental illness." (*Id.*). However, Claimant has failed to specify where in the record this unequivocal statement exists, and the undersigned has been unable to locate such an assertion. On the contrary, the Prestera medical records are replete with direct quotes from the Claimant and notes specifically referring to Claimant's own "reports" of various symptoms and difficulties. (Tr. at 402, 404, 405, 406, 491, 493, 520, 521, 522, 524, 527, 540, 541, 542, 544, and 545). Moreover, in a letter dated July 15, 2009, Prestera therapist Mary Smith cites Claimant's own reports of family arguments and minimal contact with the outside to bolster her conclusion that Claimant "would have great difficulty interacting and appropriately performing tasks in a work setting." (Tr. at 496). The record supports the ALJ's statement that PA Rodes' opinions were based on Claimant's subjective complaints.

Second, Claimant argues that the record reflects "frequent evidence of significant problems," rather than merely minor problems in functional areas. (Pl.'s Br. at 16). Claimant catalogs a number of instances throughout the Prestera records in support of

his claim. (*Id.* at 16-17). However, as discussed above, many of the cited records reflect subjective complaints made by the Claimant, rather than observations of his therapists. (*Id.*). Moreover, many of the cited records refer primarily to Claimant's emotional state, rather than the effect of his mental impairments on his residual functional capacity. (*Id.*). In contrast, therapist observations of Claimant's mental status during counseling sessions do in fact reflect minor problems in functional areas. (Tr. at 402-03, 404, 405, 409-10, 491, 493, 520, 521, 524, 527, 540, 541, 542, 544, 545, 644, 645-46, 647, 649, 652, 654, 655, 657, 659, 672, 673, 675, 676, 678, 680, 682). While Claimant frequently presented as depressed or anxious in mood and affect, other mental status metrics were consistently mild or otherwise unremarkable, as documented in the treatment record:

- "Appearance–casually dressed; Mood and Behavior–calm; Attitude–pleasant; Thought Content–No suicidal thoughts; Thought Process–coherent; Sensorium–fully oriented; Mood–anxious; Affect–congruent with mood; Perceptual disturbances–[Blank]; Memory–reports decrease in short term memory; Concentration and Calculations–fair; Intelligence–average; Insight and Judgment–fair" (Tr. at 402-03)

- "Sensorium–fully oriented; Mood–anxious at times; Affect–[Blank]; Speech–regular rate and tone; Thought form–coherent; Content–denies any suicidal or homicidal ideation; Hallucinations–denies a/v hallucination; Motor activity–fidgets at times" (Tr. at 491)

- "Sensorium–No change since last eval; Mood–anxious; Affect–congruent with mood; Speech–regular rate and tone; Thought form–coherent; Content–no suicidal thoughts; Hallucinations–No a/v hallucination; Motor activity–[blank]" (Tr. at 541)

- "Sensorium–fully oriented; Mood–depressed; Affect–restricted; Speech–regular rate and tone; Thought form–coherent; Content–denies any suicidal thoughts/homicidal thoughts; Hallucinations–denies having a/v hallucination; Motor activity–appropriate" (Tr. at 544)

- Reporting "no change since last eval" in Claimant's Mental Status, and noting that he denied having any suicidal thoughts or a/v hallucinations (Tr. at 649)

- Claimant's mood as euthymic (good good), but otherwise reporting "no change since last eval" in Claimant's Mental Status (Tr. at 654)

- Reporting "no change since last eval" in Claimant's Mental Status and noting that he denied having suicidal thoughts or a/v hallucinations (Tr. at 672)

- "Sensorium–no change since last eval; Mood–ok; Affect–congruent with mood; Speech–coherent; Thought form–[Blank]; Content–No suicidal ideations/homicidal ideations; Hallucinations–None; Motor activity–taps leg" (Tr. at 675)

- "Sensorium–no change since last eval; Mood–euthymic; Affect–no change since last eval; Speech–no change since last eval; Thought form–Coherent; Content–denies suicidal ideations/homicidal ideations; Hallucinations–None; Motor activity–no change since last eval" (Tr. at 682)

Third, Claimant objects to the ALJ's statements expressing skepticism as to PA Rodes's opinion of Claimant's limitations. Specifically, Claimant objects to the ALJ's conjecture that more "aggressive treatment modalities may be advisable" were Claimant's impairment as severe as he claimed. (Pl.'s Br. at 20). Claimant asserts that "no medical report suggests that plaintiff has not been pursuing a valid course of treatment" from Prestera Mental Health between December 2007 and July 2009. Additionally, while Claimant concedes that there was no significant decline in his condition, he argues that there was also no significant improvement, and that his condition was "disabling throughout the relevant time period." (Pl.'s Br. at 20). However, the ALJ's rationale for discounting PA Rodes' opinions appears to be based upon the evidence that PA Rodes' assessment is inconsistent with both the treatment notes which formed the basis of her assessment of Claimant's limitations, as well as with the overall record. (Tr. at 25).

There is ample evidence in the record demonstrating that PA Rodes' opinions of Claimant as "markedly limited" and "extremely limited" in various residual functional

areas were internally inconsistent with the objective evidence of record treatment notes. The record does reflect that Claimant suffered from depression and some anxiety, for which he received monthly discussion-based therapy sessions and medication prescribed on a bimonthly or quarterly basis. However, aside from Claimant's mood and affect, the mental status observations by both therapists and PA Rodes consistently reflect relatively mild, if any, other mental limitations during therapy and medication sessions. (Tr. at 402-03, 404, 405, 491, 493, 527, 540, 541, 542, 544, 645, 647, 649, 650, 652, 654, 655, 657, 659, 672, 673-74, 675, 676, 678, and 682). Additionally, the "Functional Status/Treatment Plan" section of every internal assessment indicated that Claimant required only "Minimal Assistance" in conducting "Activity of Daily Living" and "Maintain Relationships;" had "No History of Functional Deficit" in his ability to "Self Administer Medications," "Maintain Personal Safety," or "Access Other Services;" and was "Independent with Past History of Functional Deficit" as to "School[ing]." (Tr. at 416, 533-34, 551-52, 637-39, 665-66). Moreover, the most generous reading of the "Adult MH/SA Functional Assessment Instrument" of Claimant's internal assessments indicates only moderate dysfunction as to some functional categories based upon specific questions regarding Claimant's functional capacities. (Tr. at 534-37, 552-55, 639-41, and 666-69). This is consistent with Claimant's Global Assessment of Functioning (GAF) Score of 55, which did not change throughout the entire course of his treatment at Prestera. (Tr. at 417, 538, 556, 642, and 671).

The record also reflects that PA Rodes's RFC Assessments are inconsistent with all of Claimant's other mental health evaluations, including the one that Claimant himself initiated with Ms. Kelly. First, consultative examiner Ms. Durham conducted a thorough mental status exam which revealed no abnormalities with respect to

Claimant's attitude/behavior, speech, orientation, thought process, thought content, perception, insight, judgment, suicidal/homicidal ideation, immediate memory, recent memory, remote memory, concentration, or psychomotor behavior, though she did describe Claimant's mood as dysphoric and his affect as restricted. (Tr. at 451). Ms. Durham did diagnose Claimant with depressive disorder not otherwise specified and anxiety disorder not otherwise specified based upon Claimant's self-reports of depressed mood and frequent anxiety and worry. (*Id.*). Nevertheless, she found his social functioning, persistence (ability to stay on task), and pace to be within normal limits. (Tr. 451-52). Second, Dr. Saar likewise diagnosed Claimant with depressive disorder not otherwise specified and anxiety disorder not otherwise specified, but found that Claimant suffered from no functional limitations related to his mental impairments with respect to Activities of Daily Living; Maintaining Social Functioning; Maintaining Concentration, Persistence of Pace; or Episodes of Decompensation, Each of Extended Duration.[7] (Tr. at 458-60, 465). Significantly, in determining that Claimant "can manage basic activities of daily living and social interactions," Dr. Saar found Claimant to be only "partially credible" during their consultation. (Tr. at 467). Third, Claimant's consultative examiner, Ms. Kelly, conducted a RFC assessment, in which she described him as "markedly limited" in only his abilities to: work in coordination or proximity to others without being unduly distracted by them, and accept instructions and respond appropriately to criticism from supervisors. (Tr. at 479-80). With respect to all other RFC listings, Ms. Kelly described Claimant as only either "slightly limited" or "moderately limited." (*Id.*). Ms. Kelly diagnosed Claimant with depressive disorder not

---

[7] Although the ALJ declined to adopt Dr. Saar's opinion that Claimant did not have any severe mental impairments, (Tr. at 16), Dr. Saar's assessment is consistent with a preponderance of the record relating to Claimant's RFC.

otherwise specified and anxiety disorder not otherwise specified. (Tr. at 477). This is consistent with the result of Claimant's Beck Depression Inventory-II test, which reflected severe levels of depression. (Tr. at 475). Notably, however, both the Minnesota Multiphasic Personality Inventory-2 and the Million Clinical Multiaxial Inventory-III were invalid "probably because of some symptom magnification on [Claimant's] part." (Tr. at 476). Fourth, Consultative examiner Ms. Tate conducted a RFC assessment, in which she assessed Claimant as having either "none" or "mild" limitations with respect to all functional areas. (Tr. at 683-84). In her Mental Status Examination, Ms. Tate noted mildly deficient recent memory and concentration, but otherwise noted no abnormalities with respect to Claimant's mood, affect, thought processes, thought content, perception, judgment, insight, suicidal or homicidal ideation, immediate memory, remote memory and psychomotor behavior. (Tr. at 689). Neither Claimant's Prestera treatment notes and internal assessments, nor the mental health evaluations conducted by other practitioners are consistent with PA Rodes' RFC opinions.

The ALJ conducted a careful examination of the relevant evidence and cited substantial evidence in the record which contradicted the assertions made by PA Rodes in her assessments. Certainly, the ALJ was obligated to consider PA Rodes' findings and opinions, which the ALJ obviously did as outlined in her written decision. Moreover, the ALJ had a duty to explain the weight she gave to conflicting medical opinions, a duty with which she also complied. Claimant would like the Court to remand or reverse this case simply because he disagrees with the ALJ's rationale for discounting PA Rodes' opinions. However, the objective medical evidence and the opinions of the state consultants and Claimant's consultant provide substantial support for the ALJ's conclusion that Claimant's functional limitations did not prevent him from performing

light or sedentary work. If the ALJ erred in expressing a lay opinion about the aggressiveness of Claimant's treatment, such an error was harmless and does not merit reversal or remand. *See Burch v. Astrue,* 2011 WL 4025450 (W.D.N.C., July 5, 2011), *citing Camp v. Massanari,* 22 Fed.Appx. 311 (4th Cir.2001) (claimant must show that absent error, the decision might have been different).

Accordingly, the Court finds that the ALJ complied with the requirements of the applicable Social Security regulations by correctly assessing PA Rodes' opinions in view of its evidentiary significance and in relation to the objective medical findings and other data contained in the record as a whole.

### 2. *Seeking Clarifying Information*

Claimant alternatively contends that at best, the record is ambiguous as to whether Ms. Rodes' opinions were inconsistent with the overall record or based on Claimant's subjective complaints. (Pl.'s Br. at 21). Claimant argues that the ALJ was therefore obligated to seek clarification as to any doubts she had about Ms. Rodes' opinions pursuant to 20 C.F.R. § 404.1512(e). (*Id.*). In contrast, the Commissioner argues that the ALJ had no duty to seek clarification of the opinions of the Prestera therapists or physician's assistant because they were not unclear or ambiguous, so much as inconsistent and unsupported by the evidence of the record. (Def. Br. at 15). Rather, the Commissioner argues that the ALJ properly weighed and discounted the opinions of the counselors and physician's assistant in accordance with the regulations. (*Id.*).

Pursuant to the applicable regulations effective at the time of Claimant's hearing, the SSA must re-contact a treating medical source for additional information when the evidence from that treating source "is inadequate for us to determine whether you are disabled." 20 C.F.R. § 404.1512(e) (Aug. 1, 2006 – Nov. 11, 2010). Specifically,

additional information must be sought "when the report from [a claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1512(e)(1). Social Security Ruling 96-5P further clarifies that "if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source of clarification of the reasons for the opinion." SSR 96-5P at *6. However, the ALJ has no duty to re-contact a medical source whose "ultimate conclusion regarding disability was wholly inconsistent with both the objective evidence contained in his treatment records and the records of the other physicians who examined [the claimant]." *Parnell v. Astrue*, No. 5:07-cv-00390, 2008 WL 4414921, at *7 (S.D.W.V. Sept. 23, 2008) (unpublished) (quoting *Jackson v. Barnhart*, 368 F.Supp.2d 504, 508-09 (D.S.C. 2005)). Rather, "SSR 96–5p requires re-contact solely when both (a) the record fails to support a treating source's opinion, and (b) the basis of the treating source's opinion is unascertainable from the record." *Alejandro v. Barnhart*, 291 F.Supp.2d 497, 512 (S.D.Tex. 2003).

In this case, both of Ms. Rodes' opinions were thorough and complete. (Tr. at 419-26, 497-502). Neither opinion was ambiguous or inadequate in describing Claimant's diagnoses, treatment, or limitations. (*Id.*). The ALJ discounted Ms. Rodes' opinions because neither the objective treatment notes, nor the evaluations conducted by other mental health professionals corroborate the extreme limitations that Ms. Rodes attributed to Claimant. The ALJ explicitly accounted for the discrepancy between Ms. Rodes's opinions and the other evaluations, stating that "Ms. Rodes' opinions are based

on the claimant's subjective complaints," rather than objective observations. (Tr. at 25). Here, Ms. Rodes' "opinion was found to be entitled to little weight because it relied on claimant's subjective complaints of [symptoms] and was not supported by the objective evidence of record, not because it was inadequate to make a disability determination." *See Strickland v. Astrue*, 2:10-cv-00765, 2011 WL 4021304, at *13 (S.D.W.V. May 31, 2011) (unpublished). Accordingly, the undersigned finds that the ALJ had no obligation to re-contact Ms. Rodes because her opinions were not inadequate to make a disability determination.

Consequently, having reviewed the ALJ's decision and the evidentiary record, the Court finds that the ALJ's consideration of Ms. Rodes' opinion was not in error. Further the Court holds that the ALJ's decision to afford Ms. Rodes' RFC opinion limited evidentiary weight was supported by substantial evidence.

### B.    Combined Effect of All Impairments

Claimant argues that the ALJ failed to consider "how [his] impairments either singly or in combination impacted [his] ability to function." (Pl.'s Br. at 23). Rather, Claimant contends that the ALJ "concocted" his RFC without specifying which symptoms could reasonably be expected to arise from his impairments, or how those symptoms could reasonably be expected to impair him. (*Id.*). Claimant appears to offer his own analysis, in which he asserts: 1) that "his anxiety produced panic attacks" which "had a significant impact on his employment capabilities." (Pl.'s Br. at 24); 2) that "[b]oth his physical and mental condition caused insomnia which was so severe he had to rest for several hours during the day." (Pl.'s Br. at 25); and 3) that several of his severe impairments are known to cause fatigue, "one of his prominent symptoms," which caused him to "need to lie down during the day." (Pl.'s Br. at 25-26). Because Claimant

makes no effort to argue that his impairments are medically equivalent to a listed impairment, the undersigned assumes that Claimant intends to argue that the overall functional consequence of his combined impairments meets the statutory definition of disability.

As the Fourth Circuit Court of Appeals stated in *Walker v. Bowen,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." 889 F.2d 47, 50 (4th Cir. 1989). The social security regulations provide that:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim*, 495 F.2d at 398. The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985). The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

In determining Claimant's RFC, the ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but that Claimant's "credibility in statements concerning the intensity,

persistence and limiting effects of these symptoms" was poor and that "the available evidence of record does not support the degree of symptom severity and/or functional limitation described by the claimant." (Tr. at 20). An examination of the ALJ's RFC assessment confirms that he took into account the exertional and non-exertional limitations that resulted from Claimant's medically determinable impairments.

The ALJ restricted Claimant to light exertional work based upon his physical conditions and further limited his climbing; stooping, kneeling, crouching, and crawling; exposure to extreme temperatures, vibration, and hazards in working with machinery in light of his postural and environmental limitations. (Tr. at 18). The ALJ also restricted Claimant to frequent, but not constant, manipulation with the hand based upon testimony at the hearing. (*Id.*). Further, the ALJ restricted Claimant to one to two-step simple type work and tasks due to mild deficits in mental functioning, and limited Claimant to brief and superficial contact with the public based upon his testimony. (*Id.*). The ALJ provided a thorough review of the objective medical evidence, the subjective statements of Claimant, and the opinion evidence. (Tr. at 18-25). Moreover, at the administrative hearing, the ALJ presented the vocational expert with a hypothetical question that required the expert to take into account Claimant's impairments in combination. (Tr. at 78-80). Despite being asked to assume all of these restrictions, the vocational expert opined that Claimant could perform such light and sedentary work as a night guard, product inspector, mail sorter, package machine tender, product inspector, and surveillance monitor, in addition to certain other jobs that also existed in significant numbers in the economy. (Tr. at 81). The ALJ's conclusion that Claimant's combination of impairments was not so severe as to preclude him from engaging in substantial gainful activity is amply supported by the medical

record.

Furthermore, although Claimant frames his argument in terms of the "combined effect" of his impairments, the crux of his objection appears to be that the ALJ did not credit all of the mental impairment limitations that Claimant alleges: namely, the effect of panic attacks and the need to rest for several hours per day. (Pl.'s Br. at 24-25). Although Claimant alleges suffering from panic attacks "as many as three times per month," he failed to mention panic attacks at any time during his hearing before the ALJ. (Tr. at 88). Prestera treatment notes containing reference to panic attacks occur only within a span of about 4 months in 2008. (Tr. at 527, 541, and 544). Moreover, although Ms. Tate diagnosed Claimant with anxiety disorder not otherwise specified "with features of panic," she nonetheless reported "none" or "mild" limitations of Claimant in all functional areas. (Tr. at 684-90). The ALJ did not err in failing to use Claimant's alleged panic attacks as a basis for further limiting his RFC.

As for Claimant's argument that he required periodic rests during the day due to fatigue and insomnia, the ALJ found "no basis for a limitation for the claimant to lie down periodically throughout the day." (Tr. at 23). While Claimant's Prestera treatment notes contain fairly regular reports of insomnia and fatigue, (Tr. at 402, 419, 491, 496, 497, 520, 521, 541, 544, 644), the remainder of the record, including multiple RFC opinions and Claimant's own reports of daily activities, is inconsistent with fatigue of such severity as to require him to lie down for an average of four hours per day. (Tr. at 62). Furthermore, the ALJ specifically found claimant's "credibility in statements concerning the intensity, persistence and limiting effects of these symptoms to be poor," as his description of symptoms and limitations was "inconsistent and unpersuasive," while his hearing testimony "appeared to be purposely vague." (Tr. at 20, 23). "[I]n

reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ." *Johnson v. Barnhart*, 434 F.2d 650, 653 (4th Cir. 2005) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)) (internal marks omitted). The undersigned also notes that credibility has been an issue for Claimant with several evaluators. (Tr. at 357, 435, 467 and 476). Substantial evidence on the record supports the ALJ's finding that Claimant was limited to "one to two step simple type work and tasks" and "brief and superficial contact with the public." (Tr. at 25). Accordingly, the undersigned is satisfied that the ALJ adequately considered and accounted for the overall functional impact of Claimant's combined impairments.

### C.      Credibility of Witness Testimony

Claimant argues that the ALJ failed to properly consider the statements and testimony of Claimant's wife and friend. (Pl.'s Br. at 31). Claimant disagrees with the ALJ's conclusion that his witnesses' testimony was inconsistent with the opinions and observations by medical doctors in the case. (Tr. at 33). Claimant also argues that the ALJ erred by discrediting his witnesses' testimony on the improper bases that 1) they were not trained medical professionals, and 2) they were friends and family member of the claimant. (Tr. at 32). Finally, Claimant questions why the ALJ accorded Claimant a limitation for manipulation of the hands, but not dizziness and stumbling. (Tr. at 33). According to Claimant, if the testimony of his wife and friend had been credited, "there can be no doubt that a favorable decision would have been required." (Tr. at 32).

Under 20 C.F.R. §§ 404.1513(d)(4) and 416.913(d)(4), the ALJ considers evidence provided by "other non-medical sources," including spouses and friends of the Claimant. 20 C.F.R. §§ 404.1513(d)(4) and 416.913(d)(4); *Morgan v. Barnhart*, 142 Fed. Appx.

716, 720 (4th Cir. 2005). Social Security Ruling 06-03p provides guidance on how to treat "other non-medical sources." SSR 06-03p, at *5. "In considering evidence from 'non-medical sources' who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06-03p, at *6. The Ruling emphasizes that "there is a distinction between what an adjudicator must consider and what the adjudicator must explain." *Id.* at *6. Generally, the ALJ must "explain the weight given to these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Id.* at *6.

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessment for that of the ALJ; rather, the Court must review the record as a whole and determine if it is sufficient to support the ALJ's conclusion. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence . . . or substitute its own judgment for that of the Commissioner." *Hays,* 907 F.2d. at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984) (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va.1976)). Here, sufficient evidence supports the ALJ's credibility determination.

Mrs. Beck and Mr. Burk testified to Claimant's severe debilitation.[8] (Tr. at 65-76). As the ALJ observed, this extreme level of limitation is simply not consistent with the preponderance of medical opinions on record. (Tr. at 25). Claimant argues cursorily that his witnesses' testimony and statements "were consistent with the opinions of all his treating mental health providers and the opinion of Psychologist Sheila Kelly," but he fails to account for the opinions of Dr. Saar, Ms. Durham, and Ms. Tate. (Tr. at 455-68, 449-52, and 683-90). Given what little weight the ALJ accorded to the Prestera assessments of Ms. Rodes, Ms. Wilson and Ms. Smith, testimonial consistency with the Prestera opinions hardly bolsters Claimant's case. Regarding Ms. Kelly's opinion, the ALJ noted that her evaluation was apparently prepared solely for litigation purposes. (Tr. at 470). Furthermore, it is not clear that Ms. Kelly's opinion, which noted "marked limitation" in only two functional areas, is particularly consistent with the witnesses' testimony of more extreme debilitation. Although Ms. Kelley's opinion does include reports by Claimant which are similar to the testimony of his witnesses, two of the tests that Ms. Kelly conducted were invalid "probably because of some symptom magnification on [Claimant's] part." (Tr. at 476). As for the witnesses' testimony of Claimant's dizziness and stumbling, the undersigned notes that complaints of such symptoms do not appear in any of the physical or mental health evaluations on record.

---

[8] As Claimant acknowledges in his brief, Mrs. Beck testified that Claimant had difficulty "getting out in public and dealing with people," was "quick to anger," had "periodic emotional outbursts," had difficulty taking directions from others, was easily irritated by his children, slept poorly and required naps during the day, and couldn't drive due to dizzy spells. (Pl.'s Br. at 30, Tr. at 65-69). Mrs. Beck also testified that Claimant was "fairly moody and emotional," isolated himself in his room "two or three days a week," had short term memory problems, and required his wife to monitor his medicine. (Tr. at 65-69). Regarding Claimant's physical health, Mrs. Beck testified that Claimant suffered from back pain, shoulder pain, difficulty holding objects without dropping them, and was unable to control his blood sugar levels such that he frequently passes out. (Tr. at 65-69). Mr. Burk testified that Claimant required frequent sitting breaks because he became winded easily, suffered from short term memory problems, had difficulty holding coherent conversations, was clumsy and tripped over things, could no longer engage in welding and sanding, forgot his train of thought "constantly," and suffered from frequent dizzy spells. (Tr. at 70-76).

(Tr. at 343-48, 350-57, 428-35, 449-53, 455-68, 470-81, 683-91).  The ALJ did not err in discounting the "other non-medical source" testimony of Claimant' witnesses as against the weight of the objective medical evidence on record. 20 C.F.R. §§ 404.1513(d)(4) and 416.913(d)(4); SSR 06-03p. To the extent that the ALJ may have improperly discredited the witnesses' testimony on the basis of familial and relational bias, that error was harmless as their testimony was inconsistent with the preponderance of the record. *See Morgan*, 142 Fed. Appx. at 724 (supporting Claimant's argument "in principle," but declining to address the issue).

Having reviewed the Transcript of Proceedings, including the ALJ's written decision, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulations, case law, and Social Security rulings and is supported by substantial evidence. 20 C.F.R. §§ 404.1513(d)(4) and 416.913(d)(4); SSR 06-03p; *Morgan*, 142 Fed. Appx. at 724.

### D.    Incomplete Hypothetical

Claimant argues that the ALJ's hypothetical question to the vocational expert was incomplete because it did not adequately account for Claimant's moderate limitation on "concentration, persistence, or pace," despite the ALJ's finding that such a limitation existed. (Pl.'s Br. at 34). According to Claimant, the ALJ erred by simply limiting Claimant to "one and two step simple type work and tasks" and "brief and superficial contact with the public," rather than employing a function-by-function inquiry of Claimant's mental capacity to work. (Pl.'s Br. at 34, Tr. at 80). The Commissioner disagrees with Claimant, arguing that the ALJ specifically addressed Claimant's complaint in her decision. (Def. Br. at 14). In her decision, the ALJ explained in a footnote that "the Claimant has only mild deficits in mental functioning, and the

limitations in the mental residual functional capacity would seem to be more favorable to the claimant's case." (Tr. at 18 n.1).

It is well-established that for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *Walker v. Bowen,* 889 F.2d 47, 50–51 (4th Cir. 1989). While questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record. *See Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3rd Cir. 1987). Circuit courts are split on the specificity with which an ALJ must tailor hypothetical questions to account for limitations on persistence, pace, or concentration. *Compare Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176 (11th Cir. 2011); *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010); *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004) *with Smith v. Halter*, 307 F.3d 377 (6th Cir. 2001); *Howard v. Massanari*, 255 F.3d 577 (8th Cir. 2001); *see also Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008). In a Fourth Circuit case in which the Claimant argued that the ALJ's hypothetical did not account for certain severe limitations, the Circuit Court distinguished *Winschel* and *Ramirez* on the ground that a valid explanation for the ALJ's hypothetical was supported by the record; the Claimant's severe impairment had been successfully treated and therefore her RFC was not restricted. *Thompson v. Astrue*, 442 Fed.Appx. 804, 806 n.2 (4th Cir. 2011). Accordingly, the District of South Carolina has held that:

> an ALJ's finding that a claimant is "moderately limited" with respect to concentration, persistence, or pace does not, in itself, establish any limit on the claimant's residual functional capacity. Rather, the proper focus is on the underlying medical evidence and whether the residual functional capacity determined by the ALJ and presented in a hypothetical question to the VE adequately reflects this medical evidence.

*West v. Astrue*, 2012 WL 988113, No. 4:10-CV-2712-MBS at *11 (D.S.C. Mar. 21, 2012).

In the present case, although the ALJ gave Claimant "maximum benefit" of the doubt in finding moderate difficulties in "concentration, persistence or pace," she only limited Claimant to "one and two step simple type work and tasks" based upon the underlying medical evidence. (Tr. 17, 18). In her evaluation, Ms. Durham found Claimant's persistence, concentration, and pace to be within normal limits based upon clinical observation. (Tr. at 451-52). Ms. Durham also found Claimant's recent memory and remote memory to be within normal limits. (Tr. at 451). Ms. Kelly found "no significant problems in attention and concentration." (Tr. at 476). Ms. Tate found Claimant's persistence and pace to be within normal limits based upon clinical observation, but his concentration to be "mildly deficient." (Tr. at 690). She found Claimant's immediate memory to be within normal limits, but his recent memory to be mildly "deficient." (Tr. at 689). In light of the medical evaluations on record relating to Claimant's concentration, persistence, and pace, the ALJ's limitation of "one to two step simple type work and tasks" seems quite generous, and certainly supported by substantial evidence. The RFC finding and, hence, the hypothetical question demonstrate that the ALJ fairly accommodated Claimant's moderate difficulties in concentration, persistence, or pace to the extent that they were supported by the record. In light of the medical evidence before the Court and the ALJ's substantiated RFC finding, the undersigned concludes that the ALJ posed a proper hypothetical to the vocational expert.

## VIII. <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this

matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  September 7, 2012.

_____
Cheryl A. Eifert
United States Magistrate Judge